Mr. Justice Clayton
delivered the opinion of the court.
This was an indictment in the circuit court of Lowndes county, for murder. The prisoner was convicted upon circumstantial evidence, and has brought his case to this court for revision.
There are but three acts of the circuit court complained of by bill of exceptions; one, the admission of certain testimony; the others, the refusal to give two charges asked by the counsel of the defendant. Upon these we shall remark in conclusion; and shall first consider the refusal to grant a new trial.
This point has been pressed with great earnestness, and it has been insisted with much zeal, that the verdict is without any sufficient testimony. The inconclusiveness of circumstantial proof, and the danger to be apprehended from convictions upon that species of evidence, have been dwelt upon with much force.
It is certainly true that great care and caution should be used, in the investigation of such testimony. This is true also of every other kind. All human testimony may be false. Our own perceptions may be wrong; our own senses may deceive us. Whilst this should teach ns caution in the forming of our opinions, and deliberation in adopting conclusions, it should not make us carry our doubts too far, because we should thereby be rendered unfit for all the practical duties of life. Such is the state of things, which surround us in life, that in all which concerns ourselves and our highest interests, we are compelled to act upon testimony, and often upon that testimony which circumstances afford. The same rule is carried into judicial proceedings. Circumstantial evidence has been received in every age of the common law, and it may rise so high in the scale of belief as to generate full conviction. When after due caution this result is reached, the law authorizes its ministers to act upon it.
After a careful review of the subject, Starkie lays down the *490 only rule, which can be regarded of practical application. “.What circumstances will amount to proof,” he says, “ can never be matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury.” “On the one hand, absolute metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty, to the exclusion of every reasonable doubt; even direct and positive testimony does not afford grounds of belief of a higher and superior nature.” 1 Stark. 577. ■
We shall proceed, in connection with this rule, to consider the evidence most material in this cause, without dwelling on some of the. facts which have a more remote bearing. It is in proof that, on the day of the murder, the deceased went from his residence to the town of Columbus, a distance of twelve miles; that he rode a small horse, and from age stooped forward as he rode. That on his way home, he crossed the ferry at Columbus, about an hour before sunset. That in point of fact he never reached home alive, but his body was found the next day in a small clump of bushes, some thirty or forty feet from the road, and rather more than a mile from his house. There was a wound in the back of the neck, occasioned by a ball from a gun or pistol ; there was powder in the inner surface of the wound, and the skin around it, as well as a straw or chip hat which he wore, were blackened with smoke and powder. The face from the eyes down had been eaten up by hogs, but no other part of the body had received much injury. The body had been dragged into the bushes thirty or forty feet from the road. There was an impression made by a ball upon a tree near the spot, some six feet from the ground on the side next the road, and the ball was found at the foot bruised and flattened. The skull above the eyes was sound-,' except that a part of the bone on the right side was detached. There was a saddle found on the spot, with blood upon the right stirrup leather. There were several traces of blood on the ground and the clothes. The murder was committed on a private road leading to the house of the deceased, a little distance from the public road. A report of a gun or pistol *491 was heard by several of the neighbors, about half an hour, or an hour after daylight down. The body was found’ about ten or eleven o’clock the next day; a jury of inquest was held, which terminated its sitting about ten o’clock at night, and up to that time no one was accused of the murder.
It. was in proof that the prisoner lived with his father near the deceased; that he also went to Columbus on the day of the murder, starting after the deceased did. That he was seen there on several occasions during the day, in company with J. F. To-land, a son of the deceased. That they spent a great part of the day together, in a billiard-room attached to a grocery, in which' there was no other person at the time. That they were not engaged at play, but apparently upon business. That on being invited to dinner, young Toland at first declined, saying that his father was in town, and that he did not wish to be seen by him, but that he afterwards consented to go.
That the prisoner crossed the ferry about two hours before sunset, and consequently about an hour before the deceased. About sunset the prisoner overtook- two witnesses, Sandifer and Riddle, some five miles from Columbus, and rode with them three or four miles. He was riding a horse of good size. He conversed freely with the witnesses, and told them his name. About seven miles from Columbus they overtook the deceased, who was riding very slowly in the rear of a wagon. At the house of Mills, near by, eight miles from Columbus, they got some water. A short distance from that point, the prisoner said he was going to Newsom’s to get supper, and asked Riddle to go with him. Newsom lived about one hundred yards from the road, and there were thick woods between the road and his house. The witness did not go. McCann left them, but whether he went to Newsom’s does not appear from the- evidence. About a mile from Newsom’s, near .Gilmer’s gate, a man passed these two witnesses at full gallop, whom they did not recognize, but who, from other-testimony, is shown to have been J. F. Toland. After they passed Gilmer’s gate, they were not overtaken by any other person. The road to the residence of old Mr. Toland leaves the Gilmer road a short distance beyond his gate. The *492 murder was committed on this road, not very far from the Gilmer road, in a wood which extends from Gilmer’s to the spot where the body was found. Near this place, there is a road leading from the Gilmer road to McCann’s.
There is no direct trace of the prisoner except in his own declaration, after he left Sandifer and Riddle, until he reached his father’s house some half hour after dark, according to the testimony of his brother. The murder occurred near Cross’s lane, one and a half miles from McCann’s. Some ten, or twenty, or' perhaps thirty minutes after the report of the gun or pistol, Lyon, who lived near the road leading from the Gilmer road to McCann’s, heard a horse galloping, and observed that he left the road and took an unfrequented path, not likely to be known by any except those who lived near, leading through the woods in the direction to old Mr. McCann’s. Nicholas Morgan makes the same statement, with the addition that he saw a rider on the horse.
The next day the body was found, and a jury of inquest held as already stated. During the same morning J. F. Toland went to the house of old Mr. McCann. Towards two o’clock of the same day, the prisoner was seen in company with his brother, some three or four miles from his home. They were riding rapidly through the woods, and prisoner appeared to be going off. His brother states that he went with him several miles, and that they travelled sometimes in the road, and sometimes in the woods; that the prisoner told him he was going away, because the grand jury had found a true bill against him for an assault with intent to kill. A witness states that a day or two after the murder, he heard some one at the Noxubee turnpike, about two o’clock at night, calling out, and from the voice thought it was McCann. He did not see him, but had known him before. He wanted to buy corn and fodder for his horse, and said he had been lost in the swamp. This was twelve or fifteen miles from the place of the murder. The next place he was seen, so far as the proof shows, was at Carrollton. He there exhibited great apprehension of being arrested. He told a witness that he had not killed old Mr. *493 Toland, bat he was accused of it; that the body had been found nearly eaten up by the hogs, and that it would be very hard for him to prove his innocence, as he was the last man seen by an overseer that night behind Toland, near Cross’s lane, before Toland was killed. He also stated that Toland’s children had given him money and weapons to leave, and had promised to write to him. The same evening he left Carrollton on foot, having sold his horse. A few days afterwards he was arrested in the county of Lafayette, and voluntarily stated after his arrest, that he had heard that Toland had been killed, and that he did not know he could prove himself clear. Before his arrest he had denied his name; said that his name was Wilson, and that he was on his way to Tennessee to see his relations. After his arrest, and whilst on his way to Columbus, a witness at Pontotoc remarked to hitn, that he was in a tight place; he replied, that he thought not. To another remark, he said he knew he was accused of killing Toland, and that was the reason he left.
There was no proof that the prisoner had any pistol or other arms on the day of the murder.
These are the most material facts to be gathered from the testimony on both sides. We shall proceed to consider their effect, in order to determine whether they sustain the verdict of the jury.
There is an absence of all effort, on the part of the prisoner, to explain two circumstances in the early part of the transaction, which have some bearing in the case. The first is the failure to show where he was, from the time he crossed the river, until he overtook Sandifer and Riddle at sunset. The other is, that he did not show whether he went to Newsom’s to supper, as he said he intended to do. These are considerations of great force against him. 1 Stark. 574, 575. They seem to indicate, that he crossed the river before the decedent, so as to be sure that he should see him, and that having waited until he passed, he pursued his way homeward; that having overtaken the deceased upon the road, he again stopped, until he got in his rear, where he remained until the commission of the deed.
*494 It is almost certain that the murder was committed with a pistol; the smoke and powder upon the surface and edges of the wound, and upon the hat, show that it was fired in immediate contact with the person. The blood upon the right stirrup leather, which was the side next the woods, connected with the impression upon the tree, goes to show that he was shot upon his horse, and the range of the ball likewise shows that the person who fired was on horseback. The impression of the ball upon the side of the tree next the road, and the finding of the flattened ball at the foot of the tree, prove that the shot did not proceed from a person concealed in the woods. It is very certain that the ball could not have killed him, after it struck the tree and fell upon the ground. It is a fair conclusion, then, that the pistol was fired by some one on horseback in the road, very near to the decedent, who was higher than the deceased; bending forward on his small horse, and that the ball entered the neck, passed through the lower part of the head, and came out on the right side, detaching a portion of the bone, and having nearly spent its force, struck the tree and fell at its foot. As it was after night, the murderer had to be near his victim to be sure of his aim. It will be remembered that the prisoner rode a good sized horse, and if he perpetrated the deed from his saddle, was elevated enough above the decedent, to give the ball the direction it took. Soon after the report of the gun, the rapid galloping of a horse was heard, going from the direction of the place of the murder towards the house of old Mr. McCann; ’a rider was seen upon him, and he took an unfrequented bypath through the woods, which led in a more direct course to the house than the road. It is not shown that any one else Avent to the house that night. The prisoner reached home, according to the testimony of his brother, about half an hour after dark, Avhich was about the time of the report of the gun, according to the other Avitnesses. If there were any certainty' as to the precise time of these several incidents, and the exact moment Avas fixed at which each took place, then it Avould be established that the prisoner Avas at home when the deed was committed. All experience, however, proves that but little reliance can be *495 placed upon the recollection of witnesses, as to the exact moment of any occurrence. Men generally take so little note of the passing of time, that an approach to accuracy is all that can be expected. The killing took place about a mile and a half from McCann’s. It is clear that but little time was spent at the spot by the murderer. The body was dragged a few paces from the road, and no attempt was made either to bury it, or carefully conceal it. The saddle and hat of the deceased were left where they fell. There was no appearance of the trampling of a horse, as if he had been tied and detained. It was the work of only a moment or two, followed by immediate flight to avoid detection. A rapid gallop, such as Lyon and Morgan describe, would have carried a person from the scene to McCann’s certainly in fifteen minutes. The early hour at which the prisoner reached home, almost precludes the belief that he stayed at Newsom’s to supper, if indeed he went there at all.
These are the circumstances as developed up to the time of the killing, and however much they point to the guilt of the prisoner, they may leave room for a reasonable doubt. But the evidence does not close here. By far the strongest portion has been furnished by the conduct and declarations of the prisoner, subsequent to the deed.
There are no circumstances which require comment, on the morning after the murder, until the interview with J. F. Toland. That interview appears to have prompted his immediate flight. He stated at Carrollton, that the children of Toland had furnished him with money and weapons to leave. He saw none of the children, so far as the evidence discloses, except Frank. If he had no agency in the act, it is not at all probable that he could have been bribed or induced by Frank Toland, as has been argued, to fly before he was accused. A consciousness of innocence would have led him to abide the issue, and to see whether time would not disclose the real perpetrator. But he fled on the instant, and he must be content to bear whatever weight this circumstance furnishes against him. The consequences of his own act must fall on his own head. He was on his way before two o’clock of that day. The jury of inquest *496 did not return their verdict until ten o’clock of that night, and up to that time, no whisper had been heard that he was accused or suspected. His fears induced flight before the voice of accusation' was raised. The excuse which he offered to his brother for leaving, was, that an indictment had been found against him and his father, for an assault and battery with intent to kill. But he had been the previous day to Columbus, the .county town, and had not been disturbed. It does not appear that any process had issued upon the indictment, or that there was any necessity from that source for such sudden flight.
It was probably on the night of the same day, that he was at the Noxubee turnpike. He had] been lost in the swamp, as he stated; for the reason, probably, that after parting with his brother, he still endeavored to make his way through the woods.
His conduct at Carrollton is not easy .to reconcile with a belief of his innocence. He exhibited great fear of being arrested; put his hand upon his pistol, and threw himself into a defensive attitude, when a stranger entered the room in which he was. He then stated the fact of the killing, and of the finding of the body eaten up iri part by the hogs, and said he had left, because he was the last person seen behind the old man, near Cross’s lane,- before he was killed, and that it would be hard for him to prove himself clear. This declaration is decisive of his fate. It brings him to the very theatre of the murder, at the time it .was committed, and if he did not do the deed himself, it is almost certain that he would have seen the person who did. He might then have saved himself by disclosing the real murderer. How did he know that he was the last person seen behind the old man before he was killed, unless he was the real murderer himself? And this statement clears up all the doubt which might otherwise have existed from the different opinions of the witnesses, as to the time of the act. By his own confession he was not at home, but near Cross’s lane, behind the old man, when drawing to the very scene of the murder. The declaration thus made, to give an appearance of innocence to the circumstances of his flight, puts the seal of guilt upon his act.
*497 In La Fayette county he denied his name, in order to elude arrest; but after he was apprehended, he voluntarily made the same explanation in substance, which he had made at Carroll-ton. It was repeated at Pontotoc, and to a remark, that it was strange he had fled before he was accused, he made no reply.
He has in this way furnished the most undeniable evidences of his guilt. If the jury has acted upon them, he has no human being to blame but himself, and his doom is upon his own head. They place his guilt beyond all reasonable doubt. They are entirely consistent with that conclusion, but utterly at war with all experience, and with all our knowledge of the ordinary motives of human conduct, if we are to believe him innocent.
The case does not call for any elaborate attempt to define the limits of the power of this court, in granting new trials in criminal cases, upon the testimony. Doubtless it is a power which may be exercised, where the jury has gone wide of the mark, and fcjund a verdict against the decided preponderance of the testimony. But it is a power which should be exercised with great caution, because our constitution and laws have provided the trial by jury, as the safeguard and protection of the lives and liberties of the citizen on the one hand, and of the safety and interests of the commonwealth on the other. It is placed by the constitution beyond the reach of legislative interference. This safeguard would be shorn of half its strength, if it might be withdrawn or disturbed by the courts, unless in a case of palpable error, or of gross abuse. This is not a case of such a character. On the contrary, after carefully considering all the testimony, and listening to all which the ingenuity of counsel could suggest, we are not at all prepared to say, that if we had been of the jury, we should have come to a different conclusion. To set the verdict aside, under such circumstances, would be an unwarrantable invasion of their province.
There were but three exceptions taken during the progress of the trial. The first was to the admission of the testimony of John P. Krecker. This witness stated, that some eight or ten days before the murder, he saw the prisoner and J. F. Toland in conversation on the Columbus bridge, some twenty or thirty *498 feet within the bridge. Witness did not hear the conversation; the prisoner had his back towards witness; put his hand in his pocket and when he saw witness looking at him, pulled some papers out of his pocket, and put them into another pocket; again put his hand into his pocket, and pulled out something. J. F. Toland took something out of his pocket that looked like a powder gourd, put it to his mouth and pulled out the stopper, and poured something into prisoner’s hand, which he supposed to be powder. The part of the bridge on which they were, was a retired place; they remained about twenty or thirty minutes.
In cases depending upon circumstantial evidence, a number of links often concur in forming the chain. It cannot be said what bounds are to circumscribe the inquiry. All which may tend to elucidate the transaction, should be admitted. 1 Starkie’s Ev. 561, et seq. The proof of the guilt of McCann, in some degree depended upon establishing a combination between him and J. F. Toland. Apart from such combination, no 'motive is shown to have existed, to lead to the perpetration of the crime. With such combination, a motive is furnished dark and hideous, it is true, and one which, for the honor of human nature, we should be glad to deem incredible, but which the-records of crime show sometimes have found place in the bosom of the child, and have prompted to the murder of the parent. This circumstance then, separated only by an interval of ten days from the fatal tragedy, might be an important aid in fixing the relation of the parties, and in disclosing their real intentions and purposes. We cannot, therefore, say its admission was erroneous.
The other exceptions relate to the refusal of the court to give certain charges asked by the counsel of the prisoner. The first of these instructions was as follows : “ That all the declarations of the prisoner brought out by the state are to be taken together, as well those in his favor, as those against him, and that the portions favorable to him are to be regarded by the jury, as being true, unless impossible in their nature, or inconsistent with other evidence in the case.” This was refused, and the following given in its place : “That in confessions by a prisoner, all must be taken together, as well that which is in his favor, as that *499 which is against him, but that the jury are the sole judges of the truth of confessions, and can receive a part and reject a part.” The instruction as given, propounds the law correctly. A late writer on evidence thus lays down the rule. 1£ If what the prisoner said in his own favor is not contradicted by the evidence offered by the prosecution, nor improbable in itself, it will naturally be believed by the jury; but they are not bound to give weight to it on that account, but are at liberty to judge of it like other evidence, by all the circumstances of the case.” 1 Greenl. 263, § 218. Roscoe says: ££ It must not be supposed, that every part of a confession is entitled to equal credit. A jury may believe that which charges the prisoner, and reject that which is in his favor, if they see sufficient grounds for so doing.” Crim. Ev. 51; 1 Stark. Ev. 283; Clewes’s Case, 4 Car. & P. 221; 3 Phil. Ev. 927; Coon v. The State, Ante, 246.
The remaining charge excepted to, was as follows: “In criminal cases the mere union of a number of independent circumstances, each of which is inconclusive in its nature and tendency, cannot afford a just ground for conviction, unless the combination is conclusive.” This was given in lieu of one asked by the counsel of the defendant, which laid down the converse of this proposition.
The instruction as given is not liable to objection. The union and concurrence of various detached circumstances may produce full conviction, when either one of them standing alone might leave room for much doubt. 1 Stark. 570.
An objection was taken to the indictment, that it charges the offence as at common law, whilst the punishment is inflicted under the statute. This objection cannot prevail. Vance v. Commonwealth, 2 Virg. Cases, 162; Ib. 378; White v. Commonwealth,. 6 Bin. 179; Commonwealth v. Searle, 2 Ib. 339; Mitchell v. The State, 8 Yerg. 514.
These are all the points made in the argument, which it is deemed necessary to notice. A careful examination of the testimony and of the points involved, has disclosed to us no error in the proceedings of the court below.- It only remains to say, that the judgment is affirmed.
*500 Mr. Potter, in behalf of the_ (prisoner, filed a petition for a rehearing upon the point, principally, of the error in the refusal of the instruction asked by the prisoner’s counsel with reference to his confessions.
The rehearing was refused, and the prisoner sentenced to be hung.